IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Rebecca S. Evans, | ) | Civil Action No.  8:13-cv-01325-DCN-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of Defendant Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for Social Security Income ("SSI") benefits.  For the reasons set forth below, it is recommended that the decision of the Commissioner be AFFIRMED.

## PROCEDURAL HISTORY

On August 4, 2009, Plaintiff filed an application for SSI [R. 205–208] and on August 20, 2009, she filed an application for DIB[1] [R. 196–204] alleging an onset of disability date of December 31, 2003 in both applications.  Plaintiff subsequently amended her alleged onset date of disability to August 4,2009.  [R. 103.] Plaintiff's claims were denied initially on December 9, 2009 [R. 137–138], and on reconsideration on August 19, 2010 [R. 141–142], by the Social Security Administration ("the Administration").  Plaintiff requested

---

[1] Because Plaintiff's date last insured was September 30, 2005, on December 17, 2011, Plaintiff withdrew her Title II claim for DIB.  [*See*, R. 264.]

a hearing before an administrative law judge ("ALJ") and on December 20, 2011, ALJ Francis W. Williams conducted a de novo hearing on Plaintiff's claims.[2]  [R. 101–136.]

The ALJ issued a decision on March 12, 2012, finding Plaintiff not disabled under the Social Security Act ("the Act").  [R. 82–93.]  At Step 1,[3] the ALJ found Plaintiff met the insured status requirements of the Act through September 30, 2005, and had not engaged in substantial gainful activity since August 4, 2009, the amended alleged onset date.  [R. 84, Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: bipolar disorder; anxiety; diabetes mellitus; chronic obstructive pulmonary disease ("COPD"); and obesity.  [R. 84, Finding 3.]  The ALJ also determined Plaintiff had the following non-severe impairments: a history of gastroesophageal reflux disease ("GERD") and hypertension.  [R. 85–86.]  At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 86–88, Finding 4.]  The ALJ specifically considered Listing 9.00, Listing 3.02, Listing 1.02, Listing 1.04, Listing 12.04, Listing 12.06 and Listing 12.09.  [*Id.*]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[,] which includes lifting up to 50 pounds occasionally and up to 25 pounds frequently. However, the claimant is able to climb ladders occasionally and is unable to climb ropes or scaffolds. The claimant is unable to have concentrated

---

[2] Plaintiff was represented by a non-attorney representative, William McBride. [R. 104.]

[3] The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

exposure to dust, fumes, gasses, or odors. The claimant is able to perform unskilled work with only occasional direct communication with the public and occasional team-type interaction with co-workers. The claimant is unable to make complex, detailed decisions. Furthermore, the claimant should not be required to adapt to greater than simple, gradual changes in the workplace.

[R. 88, Finding 5.]   Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform her past relevant work as a cashier.   [R. 91, Finding 6.]   Considering the Plaintiff's age, education, work experience, and residual functional capacity, however, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.   [R. 92–93, Finding 10.]   Accordingly, the ALJ concluded Plaintiff had not been under a disability, as defined by the Act, at any time from August 4, 2009, through the date of the decision.   [R. 93, Finding 11.] The ALJ, thus, declined to award SSI benefits.

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review.   [R. 1-7.]   Plaintiff filed this action for judicial review on May 15, 2013. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ erred by

(1)    failing to properly assess the treating physician opinions [Doc. 20 at 18–27]; and

(2)    failing to properly assess Plaintiff's credibility [*id.* at 30–32].

Plaintiff also contends the Appeals Council failed to properly consider new, material evidence submitted by Plaintiff, which relates to the period prior to the ALJ's decision. [*Id.* at 27–29.]

3

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because the ALJ

(1)     properly evaluated and weighted the medical evidence of record, including the opinions of Mr. Valdez and Dr. Way, and the GAF scores [Doc. 22 at 7–10]; and,

(2)     properly found that Plaintiff's testimony lacked credibility [*id.* at 6–7].

The Commissioner also argues that remand-based evidence produced to the Appeals Council should be denied because the evidence produced does not relate back to the time period before the ALJ's decision, but merely shows a worsening of Plaintiff's condition.  [Id. at 11-12.] Accordingly, the Commissioner requests that the Court affirm the ALJ's decision. [*Id.* at 31.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is

4

evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Commissioner*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial

5

evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Commissioner*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant

may produce further evidence on remand."). After a remand under sentence four, the court

enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*,

941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be
> taken before the Commissioner of Social Security, but only
> upon a showing that there is new evidence which is material
> and that there is good cause for the failure to incorporate such
> evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the

basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is

material to the extent that the Commissioner's decision might reasonably have been

different had the new evidence been before him; (3) there is good cause for the claimant's

failure to submit the evidence when the claim was before the Commissioner; and (4) the

claimant made at least a general showing of the nature of the new evidence to the

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. §

405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d

26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by*

*amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4] With remand under sentence

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the

---

*Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

8

impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Grant*, 699 F.2d at 191.  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

9

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C. *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant

disabled without considering the claimant's age, education, and work experience.[5]   20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."   *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).   At this step of the evaluation, the ALJ compares the claimant's RFC[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.   20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.   *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).   To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").   Exclusive reliance on the "grids" is appropriate where the claimant suffers

---

[5] The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6] RFC is "the most [a claimant] can still do despite [his] limitations."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

primarily from an exertional impairment, without significant nonexertional factors.[7]  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31

(4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving

exertional limitations).  When a claimant suffers from both exertional and nonexertional

limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case,

the Commissioner must use a vocational expert to establish the claimant's ability to perform

other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because

we have found that the grids cannot be relied upon to show conclusively that claimant is

not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to

prove by expert vocational testimony that despite the combination of exertional and

nonexertional impairments, the claimant retains the ability to perform specific jobs which

exist in the national economy.").  The purpose of using a vocational expert is "to assist the

ALJ in determining whether there is work available in the national economy which this

particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's

testimony to be relevant, "it must be based upon a consideration of all other evidence in the

record, . . . and it must be in response to proper hypothetical questions which fairly set out

all of claimant's impairments."  *Id.* (citations omitted).

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to

13

support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment

to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also*

*Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a

consultative examination is not required when there is sufficient medical evidence to make

a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the

regulations, however, the ALJ may determine that a consultative examination or other

medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he

furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing

the existence of a medical impairment that could reasonably be expected to produce the

pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain,

the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723

(4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant

has produced medical evidence of a 'medically determinable impairment which could

reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged

by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds

that the claimant has produced such evidence, the ALJ must then determine, as a matter

of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."

*Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the

Fourth Circuit, it is well established that "subjective complaints of pain and physical

15

discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if

16

> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of

pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious

as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria. *Breeden*,

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique

advantage of having heard the testimony firsthand, and ordinarily we may not disturb

credibility findings that are based on a witness's demeanor. But administrative findings

based on oral testimony are not sacrosanct, and if it appears that credibility determinations

are based on improper or irrational criteria they cannot be sustained.").

17

## APPLICATION AND ANALYSIS

**Treating Physician Opinions**

Plaintiff takes issue with the ALJ's weighing of the opinion evidence of record contending that the ALJ failed to properly assess the treating physician opinions, specifically the opinion of Gregory Valdez, L.M.S.W. ("Mr. Valdez"), the opinion of Dr. James Way ("Dr. Way"), and provider opinions reflected in the GAF scores[8] assigned to Plaintiff.  [Doc. 20 at 18–27.]

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court.  *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520.  The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir.2005) (*citing* 20 C.F.R. § 404.1527).  ALJs typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (*quoting Mastro*, 270 F.3d at 178).  While

_____

[8] A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given. Without additional context, a GAF score is not meaningful. *See Parker v. Astrue*, 664 F.Supp.2d 544, 557 (D.S.C.2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning."). In addition to the changeable nature of a GAF score and its limited validity, the Commissioner has explained that the GAF scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg. 50746–01, 50764 65 (Aug. 21, 2000). Nevertheless, "a GAF rating is simply another observation which presumably is subsumed into the medical source's final assessment," *Simpkins v. Astrue*, 2010 WL 3257789, *7 (D.S.C. May 13, 2010).  Thus, rather than discuss the GAF scores, the Court will review the ALJ's weighing of the final assessments of the medical sources of record.

the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c). Additionally, Social Security Ruling ("SSR") 96–2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*16 1996 WL 374188, at *4 (July 2, 1996). However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96–5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C .F.R. § 404.1527(e) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairments meet or equal a listing, or the claimant has a certain RFC).

**ALJ's Treatment of Medical Opinions**

19

Plaintiff alleges disability based on depression, which began worsening in November 2009, requiring an increase in medication dosage. [R. 219.] Plaintiff claims her depression is caused her to have difficulty concentrating, focusing attention and remembering details more than seven years old, and problems controlling her motor functions. [*Id.*] Plaintiff also claims she is unable to raise her arm over her head and that she is more dependent on family members for help. [R. 222.]

### Brief Medical Summary

(1)    *Gregory Valdez. L.M.S.W.*

Mr. Valdez, Clinical Director at Lee County Mental Health, provided a report dated December 14, 2011, entitled "*Report Of the Client's Psychiatric Status, History, Treament or Progress For Physicians, Other Service Providers or Agencies*" (the "Report").  [R. 637–639.] Mr. Valdez states in the Report that, according to his records, Plaintiff has been a client of Santee-Wateree Mental Health Center since September 2010 and has been treated at the Lee County office from September 2010 to the date of the report. [R. 637.] With respect to Plaintiff's psychiatric status, history and progress, Mr. Valdez wrote as follows:

> [Plaintiff] has been a client at Santee-Wateree Mental Health clinics for several years off and on.  Her most recent admission was on 9/15/10 when she presented saying that she was very depressed, not sleeping, could not concentrate and was experiencing problems with her short term memory and needed help to get back on her medications which she had stopped taking some months prior.  The clinic physicians have had a difficult time finding the right medications, in the right dosages and in the right combinations to keep [Plaintiff] emotionally and psychologically stable.  When she is having problems with her medications she become[s] agitated and has had violent outbursts in the past.  Over the years [Plaintiff] has been diagnosed as also having some symptoms of Paranoid Schizophrenia as well as a number of physical problems including diabetes, COPD and GERD.  As mentioned above the clinic MD has tried [Plaintiff] on a number of medications to help

20

her deal with her current symptomology which consists of depression, sadness, crying spell[s], an inability to concentrate, mood swings, anger, irritability, paranoia, feeling that her boyfriend is coming to kill her for leaving him, feeling that people are watching her, racing thoughts, insomnia, anxiety and severe panic attacks. It must be noted that [Plaintiff] has not made much progress in dealing with her illnesses. She continued to come to her therapy and doctors' appointments as scheduled. She presents at those visits nervous, anxious, with hands shaking and an inability to be around people, like those siting in the waiting room. Because of [Plaintiff's] diagnosis of Bipolar 1 Disorder, Depressed, Severe With Psychotic Features and past history of irritability, anger outbursts, paranoia and physical attacks and while it is beyond the scope of this clinic to determine if a person can work or not, it is my professional opinion that it would be very difficult for [Plaintiff] to seek employment let alone keep a job if she could find one.

[R. 638.]

2.    *Dr. James H. Way, Ph.D.*

On August 17, 2010, Dr. Way, a licensed clinical psychologist, performed a consultative psychological evaluation of Plaintiff, which included a clinical interview and mini-mental state examination. [Doc. 614–617.] Dr. Way's evaluation documents that Plaintiff has experienced psychiatric treatment at varying intervals over the past 20 years and that treatment has been inconsistent. [R. 615.] Dr. Way noted that, over the past three months, Plaintiff has experienced depression and sadness on a daily basis and has had decreased interest in activities, diminished sense of pleasure, feelings of helplessness, hopelessness, and worthlessness; is anxious and withdrawn from others; experiences irritability; and has panic attacks. [*Id.*] Plaintiff also described experiencing episodes of mania where she experiences "expansive mood, increased goal-directed activities, decreased completion of projects, increased energy level, racing thoughts, decreased need for sleep and increased sexual desire." [*Id.*]

21

Dr. Way noted that Plaintiff ambulated independently and without apparent difficulty. [R. 616.] She was dressed casually and he assessed her grooming as fair, but noted that she had not combed her hair or put on make-up. [*Id.*] Dr. Way also noted that Plaintiff was alert, responsive and cooperative; had good eye contact; and that her speech was clear, coherent, goal directed, and without articulation difficulties. [*Id.*]  Her tone, however, reflected a depressed mood and subdued presentation throughout most of the session. [*Id.*] Upon completing his assessment of Plaintiff, Dr. Way concluded that

> The patient possesses adequate intellectual skills to perform basis self-care tasks, to perform other basic activities of daily living, and to learn at least simple, repetitive, and unskilled occupational tasks. Currently, however, she is noted to be functioning quite poorly with regard to activities of daily living secondary to significant depression. She also has a very long history of instability and inconsistent functional capacity in many life areas secondary to significant symptoms consistent with bipolar disorder. Psychiatric symptoms have interfered with her living situation, providing care for her children, relationships, and occupational functioning. Symptoms persist. Psychiatric treatment has been inconsistent. She is in need of consistent psychiatric treatment. The patient was provided with some information regarding bipolar disorder and the need for consistent treatment. She responded well to the discussion and reported that she would return for psychiatric treatment in the near term. The patient is able to understand the spoken word and to follow the flow of conversation. Concentration will be impaired at times. The patient may be easily overwhelmed currently secondary to psychiatric symptoms. Concentration and persistence may well be impaired at varying intervals.

[R. 616–617.]

### 3.    *Other Medical Sources of Record*

On November 18, 2009, Plaintiff presented to Dr. Douglas R. Ritz ("Dr. Ritz") for a mental status exam on referral by the Disability Determination Division, based on allegations of bipolar disorder, PTSD and anxiety. [R. 381.]  At that time, Plaintiff lived with her boyfriend. [R. 382.]  Plaintiff's daughter, who lived with a relative due to school

concerns, visited Plaintiff on weekends.  [*Id.*] Plaintiff reported that, if she's feeling good when she gets up, she does chores; if not, she lies around. [*Id.*] Plaintiff also reported that she might go days without bathing and that she spends time with her family but has few outside friends. [*Id.*]  On exam, Dr. Ritz noted Plaintiff's grooming and hygiene were both good and her speech quality was clear in terms of articulation and relevance. [R. 383.] He also noted her gait and posture were normal but her mood was anxious and her affect flat; and that she was logical and coherent but had no goals for herself. [*Id.*] Dr. Ritz recommended Plaintiff continue her mental health treatment and opined that Plaintiff might be able to handle an unskilled-typing work setting and certainly was able to carry on a conversation and respond appropriately to his questions. [*Id.*] Dr. Ritz did note, however, that there has been some deterioration in personal habits, social functioning was fairly limited, and there may be problems in completing tasks within the job-related setting. [*Id.*]

A Physical Residual Functional Capacity ("PRFC") Assessment completed by Dr. Warren F. Holland ("Dr. Holland") on November 30, 2009, found Plaintiff capable of occasionally lifting 50 pounds and frequently lifting 25 pounds; standing/walking/sitting about 6 hours in an 8-hour work day; and pushing/pulling in unlimited fashion, except as shown for lifting/carrying.  [R. 392.]  With respect to postural limitations, Dr. Holland limited Plaintiff to never climbing ladders/ropes/scaffolds due to her taking pain medications and muscle relaxants, but found she could frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl.  [R. 393.]  With respect to environmental limitations, due to her use of pain medications and muscle relaxants, and her asthma limitations, Dr. Holland noted Plaintiff should avoid concentrated exposure to extreme cold and heat, as well as to fumes,

odors, dusts, gases, and poor ventilation, and should avoid all exposure to hazards.  [R. 395.]

A subsequent PRFC assessment conducted on July 5, 2010, by Dr. Robert Kukla ("Dr. Kukla") found Plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently; standing/walking/sitting about 6 hours in an 8-hour workday; and pushing/pulling in unlimited fashion except as shown for lifting/carrying.  [R. 607.]  With respect to postural limitations, Dr. Kukla found Plaintiff was limited to occasionally climbing ladders/ropes/scaffolds; and frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  [R. 608.]

A Mental Residual Functional Capacity ("MRFC") Assessment completed by Dr. Kevin King ("Dr. King") on December 9, 2009, found Plaintiff was *not significantly limited* in the following areas:

1.     The ability to remember locations and work-like procedures;

2.     The ability to understand and remember very short and simple instructions;

3.     The ability to understand and remember detailed instructions;

4.     The ability to carry out very short and simple instructions;

5.     The ability to make simple work-related decisions;

6.     The ability to ask simple questions or request assistance;

7.     The ability to get along well with coworkers or peers without distracting them or exhibiting behavioral extremes;

8.     The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;

9.     The ability to respond appropriately to changes in the work setting;

10.    The ability to be aware of normal hazards and take appropriate precautions;

11.    The ability to travel in unfamiliar places or use public transportation; and

12.    The ability to set realistic goals or make plans independently of others.

[R. 414–415.]

The MRFC also found Plaintiff moderately limited in the following areas:

1.    The ability to carry out detailed instructions;

2.    The ability to maintain attention and concentration for extended periods;

3.    The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

4.    The ability to sustain an ordinary routine without special supervision;

5.    The ability to work in coordination with or proximity to others without being distracted by them;

6.    The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

7.    The ability to interact appropriately with the general public; and,

8.    The ability to accept instructions and respond appropriately to criticism from supervisors.

[*Id.*]    Dr. King indicated Plaintiff would respond "better to supportive supervision."  [R. 416.]

A subsequent MRFC conducted by Dr. Camilla Tezza ("Dr. Tezza") on August 19, 2010, found Plaintiff was *not significantly limited* in the following areas:

1.    The ability to remember locations and work-like procedures;

2.    The ability to understand and remember very short and simple instructions;

3.    The ability to carry out very short and simple instructions;

4.    The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

25

5.     The ability to sustain an ordinary routine without special supervision;

6.     The ability to make simple work-related decisions;

7.     The ability to ask simple questions or request assistance;

8.     The ability to accept instructions and respond appropriately to criticism from supervisors;

9.     The ability to be aware of normal hazards and take appropriate precautions;

10.    The ability to travel in unfamiliar places or use public transportation; and

11.    The ability to set realistic goals or make plans independently of others.

[R. 633–634.]

The MRFC also found Plaintiff moderately limited in the following areas:

1.     The ability to understand and remember detailed instructions;

2.     The ability to carry out detailed instructions;

3.     The ability to maintain attention and concentration for extended periods;

4.     The ability to work in coordination with or proximity to others without being distracted by them;

5.     The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

6.     The ability to interact appropriately with the general public;

7.     The ability to get along well with coworkers or peers without distracting them or exhibiting behavioral extremes;

8.     The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and,

9.     The ability to respond appropriately to changes in the work setting.

[*Id.*]

Meanwhile, examination into Plaintiff's physical condition continued. On February 3, 2011, Plaintiff underwent an x-ray of her right hip to determine the source of her pain. [R. 677.] Dr. Sally Regan, a radiologist, noted the study was negative with no acute abnormalities, and evidence of mild changes of osteoarthritis bilaterally [R. 677.]

### ALJ's Treatment of Medical Opinions

In evaluating the Report provided by Mr. Valdez, the ALJ concluded that it was entitled to "little weight' because, as an initial matter, the determination of whether the Plaintiff is unable to work is a determination or decision reserved to the Commissioner." [R. 90.] Additionally, the ALJ found Mr. Valez's assertions were not consistent with the record as a whole, noting that the "treatment notes of Lee County Mental Health Center, dated December 1, 2011, show that the claimant had been off her medication for close to three weeks and reported staying paranoid and having passing suicidal ideations," but at the same time, she was described as "having euthymic mood, appropriate affect, normal appearance, normal speech, no psychomotor abnormalities, and cooperative behavior." [*Id.*] Upon considering Dr. Way's opinion, the ALJ determined that this opinion was entitled to "significant weight." [*Id.*] The ALJ agreed with Dr. Way's finding that Plaintiff's "psychiatric treatment had been inconsistent and the evidence of record indicates improvement of the [Plaintiff's] mental health symptoms with treatment compliance." [*Id.*]

With respect to the other evidence of record, the ALJ gave "great weight to the opinion of State agency psychological consultant Camilla Tezza, Ph.D." as her opinion was "consistent with the record as whole, including mental status examination findings of record and the Plaintiff's mental health symptoms with treatment." [R. 91.] The ALJ gave "little

weight, however, to the opinion of State agency psychological consultant Kevin King, Ph.D" because the ALJ found Dr. Tezza's report more consistent with the record as a whole.  [*Id.*]  The ALJ gave "some, but not significant weight, to the opinions of the State agency medical consultants" Dr. Holland and Dr. Kukla, finding their "postural and environment limitations in the residual functional capacity assessment are more consistent with diagnostic imaging records and the claimant's credible symptoms of COPD." [R. 91.]

**Discussion**

Plaintiff contends that, with respect to Mr. Valdez's opinion that Plaintiff is disabled, the ALJ was not entitled to dismiss his opinion without providing good reason under the treating physician rule.  [Doc. 20 at 22.]  The Commissioner, however, argues that Mr. Valdez is an "other source," rather than a treating physician and that his opinion does not deserve the same deference.  [Doc. 22 at 7.]  Additionally, the Commissioner contends the ALJ properly found that Mr. Valdez's opinion was not consistent with the record as a whole. [*Id.* at 8.]

Under the SSRs, licensed social workers like Mr. Valdez are considered "medical sources who are not acceptable medical sources."  *See* SSR 06–03p; *see also* 20 C.F.R. § 404.1513(d). The social security regulations distinguish between opinions from "acceptable medical sources" and "other sources."  *See* 20 C.F.R. § 404.1513(d).  SSR 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "nonmedical sources."  Only acceptable medical sources can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose opinions may be entitled to controlling weight. SSR 06–03p.  Social Security Ruling 06–03p further provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision....

Upon review of Mr. Valdez's opinion in light of the evidence, the Court finds the ALJ's weighing of Mr. Valdez's opinion is supported by substantial evidence. As an initial matter, Plaintiff fails to explain how the ALJ improperly weighed Mr. Valdez's opinion other than by failing to find Plaintiff disabled. Again, a determination regarding disability is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (stating that opinions that a claimant is "disabled" or "unable to work" are reserved to the Commissioner). The ALJ expressly summarized his review of the treatment notes from Lee County Mental Health and concluded the evidence indicates Plaintiff's mental impairments improved when she was compliant with treatment. [R. 89.] Mr. Valdez likewise noted that Plaintiff had been admitted to his facility because she "needed help to get back on her medications which she had stopped taking some months prior." [R. 638.] Further, Mr. Valez acknowledged that it was beyond the scope of the clinic to determine if a person can work or not. [*Id.*] In light of the above, the Court finds no basis to find that the ALJ's weighing of Mr. Valez's opinion is not supported by substantial evidence.

With respect to Dr. Way's opinion, Plaintiff contends that by finding that Plaintiff can perform medium work, the ALJ implies Plaintiff can concentrate for a two-hour period of time without a break, which is inconsistent with Dr. Way's opinion that Plaintiff's

29

concentration and persistence "may well be impaired at varying intervals." [*See* Doc. 20 at 25–27.]  As an initial matter, the Court finds no basis for Plaintiff's contention that a finding that Plaintiff can perform medium work particular finding with respect to Plaintiff's ability to concentrate.  The definition of medium work found in SSR 83-10[9] provides exertional limitations, and makes no reference to non-exertional limitations.  Furthermore, the ALJ gave weight to Dr. Way's finding that Plaintiff's concentration and persistence may be impaired when the ALJ limited Plaintiff's RFC to "unskilled work with only occasional direct communication with the public and occasional team-type interaction with co-workers" and found Plaintiff was "unable to make complex, detailed decisions. . . [and] should not be required to adapt to greater than simple, gradual changes in the workplace."  [R. 88.] Precedent from this District holds that the RFC restrictions, such as those imposed by the ALJ here, sufficiently account for Plaintiff's moderate difficulties in concentration, persistence, or pace.  *See Smith v. Astrue*, 2010 WL 3257738, at *4 (D.S.C. June 4, 2010) (finding no reversible error where ALJ found the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace and limited the plaintiff to the performance

---

[9]The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms. The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at time (or involve equivalent exertion in pushing and pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time. *See* SSR 83–10, 1983 WL 31251, at *6.

of simple, routine tasks in a supervised environment with no required interaction with the public or team-type interaction with coworkers), *aff'd*, 2010 WL 3257736 (Aug. 16, 2010); *Gibbs v. Astrue*, 2010 WL 3585502, at *8 (D.S.C. Aug 2, 2010) (finding that limiting the plaintiff to a low-stress setting with no more than occasional decision making or changes in the work setting and no exposure to the general public sufficiently encompassed moderate difficulties in concentration, persistence, or pace), *aff'd*, 2010 WL 3585673 (Sept. 13, 2010); *see also Wood v. Barnhart*, 2006 WL 2583097, at *11 (D.Del. Sept. 7, 2006) (finding that the ALJ adequately accounted for the plaintiff's moderate limitation in maintaining concentration, persistence, or pace by restricting the plaintiff to jobs with simple instructions).  Plaintiff has made no argument that these limitations do not adequately account for Plaintiff's mental limitations.  Additionally, the medical evidence of record supports the ALJ's finding that Plaintiff can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace. [*See* R. 414, 633]  Based on the above, the Court finds no conflict between Dr. Way's opinion and the RFC decision of the ALJ.

**Credibility Analysis**

Next, Plaintiff argues the ALJ erred in his credibility analysis by failing to account for how Plaintiff's symptoms are impacting her everyday life and functioning, and by rejecting her credibility based on a lack of sufficient objective medical evidence.  [Doc. 30 at 31–32.] The Commissioner, on the other hand, contends the ALJ reasonably considered the evidence in evaluating Plaintiff's credibility, such as the fact that Plaintiff's symptoms are reasonably controlled by medication and treatment.  [Doc. 22 at 6.]

Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based upon a consideration of the entire case record.  SSR 96–7p, 61 Fed.Reg. at 34,485. The credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.; see also Hammond*, 765 F.2d at 426 (stating that the ALJ's credibility determination "must refer specifically to the evidence informing the ALJ's conclusions").

The following is a non-exhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms. 20 C. F.R. § 1529(c)(3).  If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination.  *Mastro*, 270 F.3d at 176 (holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency).

### *ALJ's Credibility Analysis*

32

In assessing Plaintiff's credibility, the ALJ indicated that he followed the required two-step process of (1) determining whether there is an underlying medically determinable physical or mental impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques, such that it could reasonably be expected to produce the claimant's pain or other symptoms; and (2) evaluating the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. [*See* R. 88–89. ] In finding Plaintiff's allegations not fully credible, the ALJ specifically considered the following evidence of record:

> Despite the claimant's allegations of rather severe leg, knee, and shoulder pain, radiographic studies of the claimant's right shoulder were negative, radiographic studies of the claimant's left shoulder, sacrum, and occyx were normal, and radiographic studies of the claimant's right hip showed only mild changes of osteoarthritis (Exhibits 4F, 11F, and 24F). Furthermore, on August 17, 2010, consultative examiner Dr. Way observed that the claimant ambulated independently and without apparent significant difficulty (Exhibit 19F).

> As for the claimant's diabetes, the medical evidence of record does not show documented complications, such as poor vision alleged by the claimant. Furthermore, laboratory records show that the claimant had a glucose level of 100 on July 7, 2011 and 77 on August 2, 2011 (Exhibit 27F).

> As for the claimant's COPD, the record indicates no reproducible results from pulmonary function tests (Exhibit 6F). Furthermore, recent treatment notes of Caresouth Carolina, dated July 7, 2011 and August 2, 2011, show that the claimant had within normal examinations of her chest, lungs, and respiration (Exhibit 27F).

> As for the claimant's mental impairments, the evidence of record indicates that her suicidal ideations are from external stressors. For example, records from the claimant's August 30, 2011 admission to Tuomey Healthcare show that the claimant stated that she had broken up with her boyfriend and was feeling suicidal (Exhibit 25F).

> Furthermore, the evidence of record indicates improvement of the claimant's mental impairments when she is complaint with treatment. For example, the February 25, 2011 treatment notes of Lee County Mental Health Center show

that the claimant reported that her medicine was working well and she was not manic or depressed (Exhibit 23F). On mental status examination, the claimant was noted as having normal appearance, cooperative behavior, normal speech, intact attention, concentration, and memory, good insight and judgment, euthymic mood, appropriate affect, no hallucinations or delusions, logical and goal directed thought process, and no suicidal or homicidal ideations (Exhibit 23F). On April 29, 2011, the claimant reported that she was not sleeping well and felt irritable (Exhibit 23F). However, the claimant, again had a normal mental status examination, including intact attention, concentration, and memory, euthymic mood, appropriate affect, and no suicidal or homicidal ideations (Exhibit 23F). However, treatment notes of Lee County Mental Health Center, dated December 2, 2011, for example, show that the claimant had been off her medication close to three weeks and reported staying paranoid and having passing suicidal ideations (Exhibit 23F).

[R. 89–90.]

### Discussion

While Plaintiff contends the ALJ's credibility findings are in error because he failed to explain how the symptoms are impacting her everyday life and functioning, [Doc. 20 at 31], the Plaintiff fails to specifically direct the Court to any finding or medical evidence which was not taken into account by the ALJ, and fails to point out any impact on Plaintiff's life or functioning not considered by the ALJ. Further, the Court finds the ALJ thoroughly considered the record as a whole and gave valid reasons for finding Plaintiff's allegations concerning the severity of her symptoms not credible. The fact that some of the evidence could have theoretically supported a different finding, as Plaintiff's arguments suggest, is irrelevant. "Credibility is the province of the ALJ." *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir.1992). A reviewing court should "generally treat credibility determinations made by an ALJ as binding upon review" where the ALJ has given specific, legitimate reasons for disbelieving the claimant's testimony. *Gosset v. Bowen*, 862 F.2d 802, 807 (10th Cir.1988).

Additionally, the ALJ is within the bounds of his discretion in disregarding Plaintiff's testimony to the extent it is inconsistent with the objective medical evidence in the record. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir.2005); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.1986); *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (noting that the "only fair manner to weigh a subjective complaint is to examine how pain affects the routine of life"). The ALJ's responsibility is to "make credibility determinations—and therefore sometimes must make negative determinations—about allegations of pain or other nonexertional disabilities." *Hammond*, 765 F.2d at 426. The Court finds that the ALJ appropriately considered the record as a whole and performed the required analysis of Plaintiff's impairments, including her subjective complaints. Plaintiff has not established entitlement to reversal or remand.

### New Evidence to Appeals Council

Finally, Plaintiff argues that the Appeals Council was required to consider evidence submitted after the ALJ's decision which was new, material and related to the time period before the ALJ's decision. [Doc. 20 at 28.] Plaintiff submits that "the new evidence renders the ALJ rationale unsupported by substantial evidence and a remand is necessary to address the new evidence." [*Id.* at 29.]

Under the SSRs, a claimant is permitted to offer relevant evidence to support his or her disability claim throughout the administrative process; and even after the ALJ renders a decision,  a claimant who has sought review from the Appeals Council may submit new and material evidence to the Appeals Council as part of the process for requesting review of an adverse ALJ decision.  20 C.F.R. § 404.968, 404.970(b).  The new evidence offered to the Appeals Council is then made part of the record.  The SSRs do not require the

Appeals Council to expressly weigh the newly produced evidence and reconcile it with previously produced conflicting evidence before the ALJ. Instead, the regulations require only that the Appeals Council make a decision whether to review the case, and, if it chooses not to grant review, there is no express requirement that the Appeals Council weigh and reconcile the newly produced evidence. *Meyer v. Astrue*, 662 F.3d 700, 705–06 (4th Cir. 2011).

As the Fourth Circuit addressed in *Meyer*, the difficulty arises under this regulatory scheme on review by the courts where the newly produced evidence is made part of the record for purposes of substantial evidence review but the evidence has not been weighed by the fact finder or reconciled with other relevant evidence. *Meyer* held that as long as the newly presented evidence is uncontroverted in the record or all the evidence is "one-sided," a reviewing court has no difficulty determining whether there is substantial evidence to support the Commissioner's decision. *Id.* at 707. However, where the "other record evidence credited by the ALJ conflicts with the new evidence", there is a need to remand the matter to the fact finder to "reconcile that [new] evidence with the conflicting and supporting evidence in the record." *Id.* Remand is necessary because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder." *Id.*

### New Evidence Submitted to Appeals Council

Council for Plaintiff submitted additional evidence to the Appeals Council on July 20, 2012, August 7, 2012, December 19, 2012, December 26, 2012, and January 9, 2013. [Doc. 20 at 27.] The Appeals Council indicated that it reviewed:

> records from Lee County, dated May 17, 2012; records from Kershaw County, dated July 19, 2012; narrative from Dr. Roosevelt G. Daniel, dated December 13, 2012; records from CareSouth Carolina, dated June 22, 2012

36

to December 12, 2012; records from Kershaw County, dated June 6, 2012 to August 21, 2012; records from Lee County dated June 6, 2012 to July 19,2012; records from CareSouth Carolina, dated March 22, 2012 to April 26, 2012.

[R. 2; *see also* R. 5 (evidence placed into record at Exhibits 28F and 29F).]

### Summary of "new evidence"

Treatment notes from Lee County Mental Health, dated December 29, 2011 and made a part of the record at Exhibits 28F and 29F, show that Plaintiff returned for a medication check and when asked about the efficacy of the medication, indicated that she "love[s] the way it makes me feel, I'm doing better. The Xanax[] keep[s] me calm so I'm not busting out with anger." [R. 757.]  Plaintiff presented alert and oriented; attention, concentration and memory were intact; judgment and insight good; thought process was logical/goal oriented (although she was having some hallucinations daily); and delusions were described as "not as bad." [*Id.*] Plaintiff returned to the clinic on February 2, 2012, after being discharged from the hospital, indicating she ran out of medication 2-3 days prior and thereafter had no tolerance for anything, could not make decisions, could not sleep, and had panic attacks.  [R. 759.]  Again, Plaintiff presented alert and oriented with her attention, concentration, and memory intact; good judgment and insight; no hallucinations or delusions; but suicidal and homicidal ideations. [*Id.*]

Plaintiff was seen again on February 23, 2012, for a medication check. [R. 761.] Plaintiff indicated that she feels "a whole lot better" on the higher dose of seroquel, she was not as "scatter-brained," and she was not hearing voices. [*Id.*]  Plaintiff, however, reported that "two girls went into [her] room and stole [her] Xanax, half [her] pain pills and [her] lasix." [*Id.*] Treatment notes indicate Plaintiff presented alert and oriented, but that her

behavior was guarded, suspicious and hostile. [*Id.*]   Treatment notes also indicate that Plaintiff's attention, concentration and memory were intact; judgement and insight were good; and Plaintiff experienced no hallucinations or delusions. [*Id.*]  Plaintiff was advised that the clinic would not replace lost/stolen medications and noted that she seemed stable on current meds. [R. 762.]

The following evidence was provided to the Appeals Council for review but not made an exhibit to the record:

* A narrative statement provided by Dr. Roosevelt G. Daniel and Jane Whiteside, FNP of CareSouth Carolina, dated December 13, 2012, providing that Plaintiff's hip pain was first documented in May 2009 and since that time has worsened. [R. 12.] The statement also provides that X-rays of Plaintiff's hip showed some arthritic (degenerative) changes in July 2012 and an MRI on August 12, 2012 revealed avascular necrosis bilaterally, requiring immediate orthopedic attention and, potential surgical intervention. [*Id.*]

* Medical records from CareSouth Carolina dated June 2012 through December 2012, including an X-ray of Plaintiff's knees and bilateral hips and showing normal and no significant abnormalities in the knees and arthritic changes and no significant abnormalities in the hips. [R. 16.]

* Medical records from Kershaw Health Medical Center dated August 21, 2012, showing the results of an MRI to the knees and bilateral hips showing mild degenerative changes in the knees with slight sagging of the anterior curciate ligament in both knees and moderate effusion in the left knee. [R. 20.] The MRI of the bilateral hip revealed findings suggesting avascular necrosis on the right and a small focus of probable vascular necrosis on the left, with degenerative changes which were felt to be mild to moderate. [*Id.*]

* Medical records from KershawHealth Medical Center, dated June 2012 through August 2012, show that Plaintiff presented to the emergency department on June 6, 2012 with complaints of stress and anxiety and having homocidal ideations against a person next door. [R. 26.] On psychosocial physical exam, Plaintiff appeared appropriate with appropriate insight; normal thought pattern and no hallucinations; good eye contact and normal speech. She was alert, anxious, oriented but agitated. [R. 27.]           Plaintiff was admitted and released the next day. [R. 30, 33–37.]

\*      Medical records from Lee County Mental Health, dated June 2012 to July 2012, show that on June 6, 2012, Plaintiff reported having homicidal ideation toward her ex-husband's ex-wife after several arguments and altercations; she wanted to beat her to death but did not act on it because of her grandchildren.  [R. 42.]  Treatment notes indicate Plaintiff was alert and oriented; appearance was normal; behavior was cooperative; memory intact; judgment fair; no suicidal ideation; but homicidal ideation.  [R. 42– 43.]

At a medication check on June 22, 2012, Plaintiff denied all symptoms and was able to recall information. [R. 44.] Notes indicate Plaintiff also denied "uncontrolled anger, suicidal ideation, homocidal ideation, depression or irritability and admits her mood is unstable, does from sad, mad agitation, glad, happy." [R. 45.] Plaintiff was described as "alert, oriented x3, in good contact with reality, [with] good eye contact [and no] abnormal movements, tics observed." [*Id.*]

At a follow up assessment on July 19, 2012, Plaintiff reported being out of Seroquel and presented with AV hallucinations, anxiety, depression, mania, suicidal and homocidal ideation, and sleep/appetite disturbance. [R. 46.] Plaintiff was described as alert and oriented with normal appearance and cooperative behavior; intact attention concentration and memory; good judgment and insight; no hallucinations, delusions, suicidal or homicidal ideation; and appropriate affect.  [R. 47.]

\*      Medical Records from Kershaw County Mental Health Clinic dated February 2012 through July 2012 show that, on March 22, 2012, Plaintiff presented with AV hallucinations, anxiety, depression, mania, suicidal and homocidal ideation, and sleep/appetite disturbance.  [R. 50.]  Plaintiff was described as alert and oriented with normal appearance and cooperative behavior; intact attention concentration and memory; good judgment and insight; no hallucinations, delusions, suicidal ideation; passing homicidal ideation; and appropriate affect.  [*Id.*] Notes indicate that Plaintiff seems stable on current meds and may be transferring to Camden where she now lives.  [R. 51.]

\*      On May 17, 2012, Plaintiff presented with AV hallucinations, anxiety, depression, mania, suicidal and homocidal ideation, and sleep/appetite disturbance.  [R. 52.]  Plaintiff was described as alert and oriented with normal appearance and cooperative behavior; intact attention concentration and memory; good judgment and insight; no hallucinations, delusions, suicidal or homocidal ideation; and appropriate affect.  [*Id.*]  Notes indicate Plaintitt seems fairly stable on current meds but is having trouble with medication supply again due to problem with stability of pap program staff.  [R. 53.]

*       Medical records from CareSouth Carolina dated March 2012 through April 2012 indicate complaints of pain in knees and hips [R. 77] and note bipolar symptoms [R. 78].

### Appeals Council's Treatment of "New" Evidence

Upon considering the additional material or "new evidence" presented by Plaintiff, the Appeals Council determined that the new information was about a later time and that it did not affect the ALJ's decision about whether Plaintiff was disabled beginning on or before March 12, 2012.  [R. 2.] The Appeals Council also returned the evidence to Plaintiff to use if she decides to file a new claim to determine whether she was disabled after March 12, 2012.  [*Id.*]

### Discussion

Upon review, the Court finds that the new evidence does not require reconsideration of the ALJ's decision.  As an initial m40atter, considering the ALJ's decision in light of the new evidence, the Court has failed to discern a basis for remanding this case for further fact finding because the new evidence does not appear to have any bearing upon whether the Plaintiff was disabled during the relevant time period addressed in the ALJ's hearing decision.[10] *See* 20 C.F.R. § 404.970(b); *Reichard v. Barnhart*, 285 F.Supp.2d 728, 733 (S.D.W.Va.2003) (citations omitted) (The requirement that new evidence must relate to the period on or before the date of the ALJ's decision, "does not mean that the evidence had to have existed during that period. Rather, evidence must be considered if it has any

_____

[10] The Court notes that "an ALJ must give retrospective consideration to medical evidence created after a claimant's last insured date when such evidence may be 'reflective of a possible earlier and progressive degeneration.' " *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 345 (4th Cir.2012) (*quoting Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir.1969)). Further, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* at 341 *(quoting Moore,* 418 F.2d at 1226).

bearing upon whether the Claimant was disabled during the relevant period of time."). Although Plaintiff attempts to describe the evidence as indicative of a condition that was present prior to the ALJ's decision, none of the physicians or medical experts make such a linkage to the relevant time period.  The evidence with respect to Plaintiff's hip pain, at best, shows a worsening of her condition after the ALJ's decision and not a condition to that level of severity at the time of the ALJ's decision; thus, this new evidence is not material. *Bishop v. Astrue*, 2012 WL 961775 at * 4 (D.S.C. Mar. 20, 2012) [Finding that new evidence was not material where physician's opinion did not address whether or not Plaintiff was disabled during the relevant time period], *quoting Edwards v. Astrue*, 2008 WL 474128 at * 9 (W.D. Feb. 20, 2008) ["The [new records] do not relate back to the relevant time period as they were both done over 6 months after the ALJ rendered his decision."]; *see also Johnson v. Barnhart*, 434 F.3d 650, 655–656 (4th Cir.2005) [Holding that the opinion of a treating physician rendered nine months after the claimant's date last insured was irrelevant].  Additionally, the mental health assessments from Lee County and Kershaw County do not appear to be inconsistent with the evidence before the ALJ prior to his decision thus, this new evidence is cumulative at best.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be AFFIRMED.

IT IS SO RECOMMENDED.

July 18, 2014                                  /s/Jacquelyn D. Austin
Greenville, South Carolina            United States Magistrate Judge